RECEIVED

NOV 2 4 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

GABRIEL MICHAEL EDWARDS,          CIVIL ACTION
            Plaintiff            NO. 1:13-cv-02416

VERSUS

DARRELL TURNER, et al.,          JUDGE JAMES T. TRIMBLE
            Defendants           MAGISTRATE JUDGE JAMES D. KIRK

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a verified complaint filed by Gabriel
Michael Edwards ("Edwards") pursuant to Bivens v. Six Unknown Named
Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct.
1999 (1971),[1] on August 2, 2013 (Doc. 1) and amended on December 5,
2013 (Doc 7).    The remaining defendants are Darrell Turner,
Counselor Watson, Mrs. Rhodes, Lt. Jones, and Lt. Lawson, employees
of the United States Penitentiary in Pollock, Louisiana ("USP-
Pollock").[2]

Edwards contends that, while he was incarcerated in USP-

---

[1] Bivens defendants are federal officials brought into
federal court for violating the Federal Constitution. Bivens-
type actions may be brought only against federal agents and not
federal agencies. F.D.I.C. v. Meyer, 510 U.S. 471, 486, 114
S.Ct. 996, 1006 (1994); Whitley v. Hunt, 158 F.3d 882 885 (5th
Cir. 1998). Under Bivens, a plaintiff may recover damages for
any injuries suffered as a result of federal agents' violations
of his constitutional rights. Channer v. Hall, 112 F.3d 214, 216
(5th Cir. 1997).

[2] Edwards' complaint against Donny Cartrette, Michael
Melton, Kim Askcarlton, "unknown medical employees" and "unknown
employees" was dismissed (Doc. 1).

Pollock on September 13, 2012, he suffered retaliation for an argument he had with Darrel Turner.  The remaining claims are for retaliation, excessive force and denial of medical care (Docs. 8, 14, 17).  Edwards contends he was forcefully removed from Food Service and injured by the staff.  For relief, Edwards asks for monetary damages and investigation of the "high rate of staff assaults."  Edwards is currently incarcerated in USP-Pollock.

Defendants answered the complaint (Doc. 18) and filed a motion for summary judgment with a statement of undisputed facts, affidavits, and documentary evidence (Doc. 22).  Edwards filed a response to defendants' motion with an affidavit (Doc. 24). Defendants' motion is now before the court for disposition.

<u>Law and Analysis</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all

material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for

3

summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

<u>Edwards' Allegations</u>

Edwards alleges in his complaint (Doc. 14) that, on September 6, 2012, he was released from ths SHU without an ID, per standard procedure, and went to food service to eat; an ID is generally required to eat a meal (Doc. 14). Edwards contends that he encountered Lt. Justinson at the entrance, explained why he did not have an ID, and was given permission to eat (Doc. 14). Edwards contends that, when he reached the ID scanner, he encountered Officer Turner, who Edwards had never seen before and who was not wearing a uniform; when Edwards again explained his lack of ID, Turner told him he would not be allowed to eat (Do. 14). Edwards contends he then told Turner that Lt. Justinson had just given Edwards permission to eat, so Turner told Edwards to bring Lt. Justinson to him; Edwards then engaged in a heated argument with Turner, obscenities were exchanged, and Lt. Justinson was contacted on the radio by Turner (Doc. 14). Edwards contends that Lt. Justinson stated he had given Edwards permission to eat, Turner made a snide remark to Edwards, and Edwards responded in kind and walked away (Doc. 14).

Edwards further alleges that, on September 13, 2012, all inmates at USP-Pollock were released from an institutional look-down and provided with their first hot meal in Food Service; due to

the look-down, the inmates  had not been out of their cells until September 13, 2012.  Edwards contends that he entered Food Service through the front door, went through a metal detector at which Turner was positioned with other staff members, including an operations lieutenant (Doc. 14).  Edwards contends he obtained his meal, seated himself with Adam Holland and Shawn Fugundes, and began to eat (Doc. 14).  Edwards contend that, a few minutes later, a highly agitated Turner approached, yelling for Edwards to get up because he was going to the tank; Turner told Edwards he would find out why when he got there (Doc. 14).   Edwards then requested to speak to Lt. Justinson, who was about fifty feet away, and turned toward him; Turner then grabbed Edwards from behind, causing Edwards to "jerk in surprise" and call out to Lt. Justinson (Doc. 14).  Edwards contend that Turner then shoved him into a wall and forcefully took him to the ground; Edwards contends that Turner or some other officer then slammed Edwards' hand into the concrete and struck it with a pair of handcuffs, breaking Edwards' hand, before restraining Edwards hands and tightening the handcuffs so tightly that Edwards' hands became numb (Doc. 14).

Edwards contends that his hand was broken when he was restrained with force on September 13, 2012, he requested medical care from every staff member he saw on September 13, 2012, and he sent a request for medical care through the nurse (Doc. 14).  On September 14, 2012, Edwards sent a written request for medical care

5

through the staff in the SHU and showed his injury to Lt. Lawson, asking for medical care (Doc. 14).  On September 15, 2012, Edwards contends he showed his injury to counselor Watson and asked for medical care (Doc. 14).  On September 16, 2012, Edwards contends he spoke to Mrs. Rhodes and showed her the severe swelling in his hand (Doc. 14).  On September 17, 2012, Edwards was given Ibuprofen for his injury (Doc. 14).  On September 22, 2012, Edwards again showed his injury to Counselor Watson and asked for medical care, and again received Ibuprofen from medical (Doc. 14).  On September 24, 2012, Edwards sent a request for medical care through Mrs. Rhodes and received Ibuprofen and an Ace bandage (Doc. 14).  On September 26, 2012, Edwards showed his injured hand to the doctor who was doing SHU rounds and told him he needed medical care (Doc. 14).  On September 28, 2012, Edwards was told that an x-ray had been ordered (Doc. 14).  On October 3, 2012, Edwards was x-rayed and received a splint; on October 4, 2012, Edwards was placed in a half cast (Doc. 14).  Edwards contends he was not scheduled to see an outside orthopedic doctor until October 10, 2012 (Doc. 14).

Issue 1 - Excessive Force and Retaliation

Edwards contends Turner used excessive force against him in retaliation.  Defendants contend that excessive force was not used against Edwards, Turner did not retaliate against Edwards, and they are entitled to a summary judgment on those issues.

1.

6

In Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995 (1992), the Supreme Court discussed the Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078 (1986) approach to evaluation of excessive force claims, and found the extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur. Hudson, 503 U.S. at 6-7, 112 S.Ct. at 999.

The Hudson court further held that, whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson, 503 U.S. at 6-7, 112 S.Ct. at 999. Also, Eason v. Holt, 73 F.3d 600, 602 (5th Cir. 1996).

Courts considering a prisoner's claim must ask both (1) if the officials acted with a sufficiently culpable state of mind and (2) if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. The objective component of an Eighth Amendment claim is therefore contextual and responsive to contemporary standards of decency. Hudson, 503 U.S. at 8, 112 S.Ct. at 999. In the excessive force context, when prison officials maliciously and sadistically use force to cause harm,

7

contemporary standards of decency always are violated.  However, the Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.  An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim. Hudson, 503 U.S. at 9-10, 112 S.Ct. at 1000.

In determining the subjective intent of the officer, the trier of fact must base its determination on relevant subjective factors suggestive of intent.  Some of the pertinent factors are the extent of the injury suffered, the need for the application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of the forceful response. Bender v. Brumley, 1 F.3d 271, 278 (5th Cir. 1993), quoting Hudson v. McMillian, 962 F.2d 522, 523 (5th Cir. 1992).  A convict, or a pretrial detainee, need not demonstrate significant injury where the force used was malicious and wanton.  The core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Bender, 1 F.3d at 278, n. 6, quoting Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992).

Therefore, Edwards must prove not only that the assault

actually occurred, but also that it was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline.

Defendants show, through their statement of material facts (Doc. 22, Ex.) and an affidavit by Darrell Turner, a staff psychologist formerly employed at USP-Pollock, that on September 13, 2012, the Captain asked Turner to take Edwards from the inmate dining area to the Captain's complex (Doc. 22, Ex.).  Turner contends that he approached Edwards in a calm and normal manner to tell him to report to the Captain's complex, Edwards refused and said he wanted to finish eating, Turner told him to comply with the order or he would be restrained and escorted, Edwards stood up and walked away, Turner twice ordered Edwards to turn around, but Edwards just yelled at Turner (Doc. 14).  Turner states in his affidavit that he then reached for Edwards' arm, but Edwards swung his arm at Turner and cursed, which Turner perceived as an attempt to assault him (Doc. 14).  Turner states that he placed Edwards against the wall and attempted to restrain him but Edwards actively resisted and pushed away from the wall so he placed Edwards on the floor, at which point other officers responded and they secured Edwards' hands behind his back and escorted him to the Lieutenant's area (Doc. 14).  Turner contends in his affidavit that any force he used against Edwards was necessary to gain control of him and that he was not retaliating against Turner due to any prior

conversations Edwards had with Turner or other staff members (Doc. 14).

Edwards admits he talked back to Turner on September 6, 2012, and resisted Turner's orders on both September 6 and September 13, 2012.   Edwards explains that, on September 13, he did not obey Turner's order and called out to Lt. Justinson because he did not know who Turner was, Turner was "highly agitated," Edwards wanted his first hot meal in several days, Edwards was "attempting to follow policy" by seeking a superior officer, and Edwards "felt in danger and threatened by Turner's actions and aggressive behavior" (Doc. 14).   However, Edwards was surprised to have found himself restrained and escorted from the dining area on September 13.

The summary judgment evidence from both Turner and Edwards shows that Turner was attempting to control Edwards, who was disobeying direct orders.   Therefore, the use of some force by Turner appears to have been justified.

Moreover, although Edwards' hand was apparently broken in the incident, Edwards clearly does not know who broke his hand or whether it was broken when it was stuck by the handcuffs or when it was slammed into the floor.   Edwards alleges in his original complaint that "Turner and others unseen were responsible for slamming [his] right hand into the concrete then striking it again with a pair of handcuffs as they roughly restrained [him]" (Doc. 1).   Edwards alleges in his amended complaint that excessive force

10

was used because his hand was broken "by staff" when "staff" slammed Edwards' hand into the concrete floor and ordered Edwards to open his hand (Doc. 7). Edwards contends he was then struck in his right hand with a pair of handcuffs as Turner "very roughly" applied hand restraints. In his brief in opposition to the motion for summary judgment (Doc. 24), Edwards stated that Turner had slammed Edwards' right hand into the concrete flood, then struck it with a pair of handcuffs, and then placed the handcuffs on Edwards. Edwards submitted an affidavit by inmate Addam Holland (Doc. 7), who stated that Turner took Edwards to the ground, then "several officers rushed to the site and pinned Mr. Edwards to the ground."

Edwards has not alleged any actions by Turner which appear to be sadistic or malicious. Rather, the fracture in Edwards' hand appears to have been accidentally incurred during a good-faith, reasonable effort by Turner and others to gain Edwards' compliance with direct orders which Edwards admitted he had not obeyed. Therefore, Edwards has not shown that excessive force was used against him.

Since there are no genuine issues of material fact which would preclude a summary judgment on the issue of the use of excessive force, defendants' motion for summary judgment should granted in favor of Turner on this issue.

2.

Edwards also claims Turner used excessive force against him in

11

retaliation, apparently because Edwards argued with Turner.

To state a retaliation claim, a claimant must allege both that the type of activity that he engaged in was protected under the constitution and that the state impermissibly infringed on his right to engage in the protected activity. Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985), citing Owens v. Rush, 654 F.2d 1370 (10th Cir. 1981). Also, Hale v. Townley, 19 F.3d 1068. 1072-73 (5th Cir. 1994); Crowley v. Sinyard, 884 F.2d 804, 812 n.9 (5th Cir. 1989), cert. den., 496 U.S. 924, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990). A prisoner must allege facts which establish that (1) he exercised a specific constitutional right, (2) the defendant had the intent to retaliate against him for his exercise of that right, (3) a retaliatory adverse act occurred, and (4) causation. Causation requires a showing that "but for the retaliatory motive the complained of incident ... would not have occurred." Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997), cert. denied, 522 U.S. 995 (1997), citing Woods, 60 F.3d at 1166. The inmate must allege more than his personal belief that he is the victim of retaliation. Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999). The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred. Jones, 188 F.3d at 324-325, citing Woods, 60 F.3d at 1166.

Edwards has not stated a claim for retaliation because he has

12

not alleged that he was engaged in the exercise of a specific constitutional right for which Turner retaliated against him.  An inmate does not have a *constitutional right* to argue with a correctional officer or to disobey a direct order by a correctional officer.

Since there are no genuine issues of material fact which preclude a summary judgment on Edwars' claim of retaliation, defendants' motion for summary judgment should be granted in favor of Turner on this issue, also.

Denial of Medical Care

Edwards contends that Rhodes, Lawson, Jones, and Watson delayed providing him medical care for his broken hand.

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811 (1994).  Because an inadvertent failure to provide adequate medical treatment does not violate the Eighth Amendment, deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition. Estelle,

13

97 S.Ct. at 291.  Disagreement with medical treatment also does not state a claim for Eighth Amendment indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

Although the Eighth Amendment does not, by its precise words, mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive adequate medical care.  A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).  A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care.  Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).

Defendants show, through their statement of material facts (Doc. 22, Ex.) and the affidavit of Jo Ann Rhodes, a clinical registered nurse employed at USP-Pollock, that Edwards was assessed by an LPN after the food service incident on September 13, 2012, no injuries were found, and Edwards did not indicate any injuries (Doc. 22, p. 406).  Rhodes also states that she saw Edwards in the

14

SHU on September 17, 2012, when he stated he had injured his right thumb during the altercation on September 13, 2012 and said his pain level was "5"; Rhodes consulted a "mid-level provider"[3] and Ibuprofen was given to Edwards for ten days (Doc. 22, p. 406). Rhodes further states in her affidavit that she next saw Edwards on September 24, 2012 in the SHU, and he complained of pain in his right thumb and palm; Rhodes consulted the Physician Assistant, provided Edwards with another ten days of Ibuprofen, and requested an x-ray for Edwards (Doc. 22, p. 406). Rhodes stated that the x-ray performed on October 4, 2012 revealed an "oblique non-displaced fracture" and a splint was placed that day; Rhodes did not identify which bone was broken (Doc. 22, p. 406). Rhodes stated that Edwards was seen by an orthopedist on October 12, 2014, who recommended removal of the splint and to begin range of motion exercised (Doc. 22, p. 406). Rhodes further stated that, on October 22, 2012, Edwards was seen by a nurse and provided with Ibuprofen for thirty days (Doc. 22, pp. 406-407). Rhodes stated that the medical staff makes rounds through the SHU every day (Doc. 22, p. 406).

Defendants also submitted an affidavit from Maxwell Dunbar, a licensed practical nurse ("LPN") employed at the Federal Correctional Complex ("FCC") in Pollock, Louisiana (Doc. 22, Ex.).

---

[3] There is no explanation as to what a "mid-level provider" is, and whether he/she is a physician.

Dunbar states in his affidavit, and defendants show in their statement of material facts (Doc. 22, Ex.) and  that, on September 13, 2012, he performed medical assessment on Edwards after the incident in which the staff used force on Edwards (Doc. 22, Ex.). Dunbar attached the video of his assessment of Edwards (Doc. 22, Ex.).  Dunbar states that he asked Edwards if he had any injuries to report,  Edwards did not report any, and the assessment did not reveal any (Doc. 22, Ex.).[4]   The video, which lasted between one and two minutes, did not show that Dunbar checked Edwards' hands, which were in restraints behind his back (Doc. 22, Ex.).

Edwards contends he told Jones about his hand injury on September 13, he told Lawson about his injury on September 14, and he told Watson about it on September 15 and 22; Edwards contends he asked all of them for medical care.

Defendants submitted an affidavit by Alfred Watson, who is employed as a counselor at USP-Pollock (Doc. 22).  Watson stated in his affidavit, and defendants show in their statement of material facts (Doc. 22, Ex.), that Edwards complained to Watson about his hand while he was in the SHU, so Watson told Edwards to submit a request to the Health Services Unit or to tell the medical

---

[4] Since Watson, Lawson and Jones all attest that they saw, thought, and said the exact same things to Edwards, their affidavits do not appear to be based on their individual, personal knowledge, as required in Fed.R.Civ.P. rule 56. Therefore, their affidavits are not given much weight.

personnel when they made a round in the SHU (Doc. 22). Watson stated in his affidavit that, when an inmate tells him he needs medical care, he usually tells the inmate to submit a request for medical care to the Health Services Unit, unless it appears to be a medical emergency and more immediate action is needed (Doc. 22, Ex.). Watson further stated in his affidavit that medical requests can be given to health services staff who conduct rounds in the SHU twice each day (Doc. 22, Ex.).

Defendants also submitted affidavits from Walter Lawson and Curtis Jones, Sr., who are both employed as Lieutenants at USP-Pollock (Doc. 22, Ex.). Lawson's and Jones' affidavits are identical to Counselor Watson's affidavit, except for their names.

Edwards contends in his verified amended complaint (Doc. 14) and statement of material facts (Doc. 24) that he was not immediately aware that he was injured because his hands were numb from the handcuffs having been applied too tightly (Doc. 14). Edwards contends he did not realize he was injured until afer he was placed in the SHU and the handcuffs were removed (Doc. 14). Therefore, Edwards did not complain of an injury until after he went to the SHU.

Edwards' medical records show that Edwards was evaluated in the health services clinic after the scuffle in the Food Service dining room on September 13, 2012, by LPN Maxwell Dunbar, that Edwards did not report an injury, no apparent injuries were noted,

and there was no indicia of pain (Doc. 60, pp. 16-17/41).  Edwards made a written request for medical attention due to severe pain in his thumb and swelling on September 14, 2012 (Doc. 60, p. 41/41).

Edwards made a written sick call request on September 16, 2012, stating that he had pain and loss of mobility in his right thumb (Doc. 60, p. 40/41).  On September 17, 2012, Edwards was seen in the SHU by Nurse Rhodes pursuant to his sick call request concerning injury to his right hand, Rhodes noted that Edwards' right thumb had a slight amount of edema at the joint with no discoloration and he had range of motion, there was a small amount of edema in his right palm, and Edwards' described his pain as "five" only on movement (Doc. 60, pp. 13/41).  Rhodes consulted the on-duty medical provider, Nurse Practitioner Paul Nordstrom, who prescribed Ibuprofen 600 mg three times/day for ten days for pain (Doc. 60, p. 14/41).

On September 24, 2012, Edwards submitted a written request for medical care for pain and swelling in his thumb and palm, and stated that Ibuprofen did not seem to help (Doc. 60, p. 39/41).  On September 24, 2012, Edwards was again seen by Nurse Rhodes in the SHU, in response to his sick call request; Rhodes noted Edwards' complaints of aching pain in his right thumb and palm on movement, which he reported was a "six" (Doc. 60, p. 10/41).  Rhodes noted that she consulted the on-duty medical provider, Physician's Assistant S. Price, who ordered Ibuprofen 600 mg. three times per

day for pain for ten days, and requested that Rhodes be seen in radiology (Doc. 60, p. 11/41).

Edwards' medical records show that, on October 3, 2012, Edwards' right hand was x-rayed and an oblique non-displaced fracture was found at the base of his first proximal phalanx with intra-articular extension (Doc. 60, p. 37/41). On October 4, 2014, Edwards was again seen in the SHU in a follow-up by RN Socia (Doc. 60, p. 7/41). Edwards complained that his right thumb was broken, his pain was a "five," his right wrist/hand/fingers were tender and he did not have a full range of motion; Nurse Socia assessed signs of a fracture and a splint was applied to his right thumb per instructions of Nurse Practitioner Cynthia Roberts (Doc. 60, p. 7/41).

On October 12, 2012, Edwards was seen by at an orthopedic clinic which found a four-week-old non-displaced fracture with minimal swelling advised that Edwards discontinue use of the splint and begin range of motion exercises of the joint (Doc. 60, p. 33/41).

On October 22, 2012, RN Reimer evaluated Edwards in the SHU in response to his sick call request for an Ibuprofen refill; Edwards reported his pain as aching and a "six" (Doc. 60, p. 2/41). Nurse Reimer noted Edwards' history of a right thumb fracture, saw swelling in his right thumb, noted that Edwards had pain on movement, and encouraged Edwards to continue "range of motion"

19

(Doc. 60, p. 2/41).  Edwards was prescribed Ibuprofen 600 mg, three times per day for thirty days by Nurse Practitioner Paul Nordstrom (Doc. 60, p. 3/41).

The non-displaced fracture in Edwards' hand constituted a serious medical need.  Defendants admit that Edwards complained that his hand was injured and he needed medical care.  Watson, Jones and Lawson all stated they did not do anything in response to Edwards' request for medical care for his injured hand except to direct Edwards to submit a written request.  However, it appears Edwards submitted a written request as early as September 14, 2012, the day after the incident in which his hand was fractured.

Nurse Rhodes stated in her affidavit that, on September 17 and 24, she gave Edwards Ibuprofen, and on September 24 she scheduled him for an x-ray.  Edwards' medical record for September 17, 2012 show that Nurse Rhodes noted Edwards' right thumb was puffy at the joint, but he was able to bend his thumb, and there was a small amount of edema in his right palm, so she consulted the "mid-level provider" (Doc. 7, Ex. B-1).  Edwards' medical record for September 24, shows that Nurse Rhodes found Edwards' thumb and palm were swollen, there was pain on movement, his edema had increased and his movement and function had decreased (Doc. 7, Ex. B-2).  Nurse Rhodes consulted the "on duty medical provider," then gave Edwards an Ace bandage and ice, recommended elevation and rest, and ordered an x-ray and pain medication (Doc. 7, Ex. B-2).  X-rays on October

3, 2012 showed an oblique non-displaced fracture at the base of Edwards' right thumb (Doc. 53, Ex. 2, p. 37/49 & Ex. 3).

Edwards' hand was broken on September 13, 2012, he requested medical attention for it as early as September 14, 2012, he was given Ibuprofen on September 17 and 24, he was scheduled for an x-ray on September 24, he was x-rayed and splinted on October 4, and he was examined by a physician on October 12, 2012.  Therefore, Edwards had a broken bone in his hand on September 13, 2012, with swelling, edema, pain, and loss of function of which he complained on September 14, 2012, but it was three weeks before he was x-rayed and four weeks before he was examined and treated by a physician.

Although Edwards was seen by a Registered Nurse and given Ibuprofen, that does not necessarily constitute adequate medical care for a broken bone.  There is no explanation as to the reason for the delay in receiving pain medication (Ibuprofen), x-rays and an evaluation by a doctor.

Defendants also contend that Edwards did not use proper channels by submitting a written request for medical care, the medical records show Edwards submitted a written request for medical care on September 14 and September 17, 2012, but he was not seen by a nurse until September 17 and he did not see a doctor until one month later.  The length of the delay in appropriate medical care for Edwards may constitute deliberate indifference to Edwards' serious medical needs.  Compare, McKnight v. Canulette,

21

190 F.3d 538 (5th Cir. 1999).

Since there are genuine issues of material fact which preclude a summary judgment on Edwards' claim that he was denied adequate medical care for his broken hand, defendants' motion for summary judgment should be denied on this issue as to defendants Rhodes, Lawson, Jones and Watson.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion for summary judgment be GRANTED as to Edwards' claims of use of excessive force and retaliation, and that Edwards' action against Turner be DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be DENIED as to Edwards' claims for denial of medical care against Rhodes, Lawson, Jones, and Watson.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before making a  final ruling.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT
WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE
SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,
FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL
FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 21st
day of November 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE